812 So.2d 106 (2002)
STATE of Louisiana
v.
Thaddeus JOHNSON.
No. 01-KA-0842.
Court of Appeal of Louisiana, Fifth Circuit.
February 13, 2002.
*109 Paul D. Connick, Jr., District Attorney, Terry Boudreaux, Alison Wallis, Assistant District Attorneys, Gretna, LA, Attorneys for Appellee.
Kyla Blanchard-Romanach, Baton Rouge, LA, Attorney for Appellant.
Composed of Judges SOL GOTHARD, SUSAN CHEHARDY and MARION F. EDWARDS.
EDWARDS, Judge.
Defendant/Appellant, Thaddeus Johnson, appeals his conviction for two counts of armed robbery. For the following reasons, we affirm the conviction.
On October 19, 1999, Thaddeus Johnson was charged in a four-count bill of information with: (1) aggravated flight from an officer, a violation of LSA-R.S. 14:108.1; as well as, (2)the armed robbery of Sylvia George; (3) the armed robbery of Welton *110 Brown; and (4) the armed robbery of Gabriel Arceneaux, all of which occurred on August 7, 1999, in violation of LSA-R.S. 14:64. On August 25, 1999, Johnson was arraigned on the charges and entered a plea of not guilty to each count.
On January 5, 2000, Johnson filed numerous pre-trial motions, including a motion to suppress identification. A hearing on the motion to suppress identification was held on October 12, 2000, and the motion was denied, over Johnson's objections.[1]
On the date of trial, February 6, 2001, the State moved to sever counts one and four of the bill of information, proceeding to trial on counts two and three. Johnson filed an oral motion in limine, seeking to exclude at trial certain evidence regarding his identification. The court denied the motion, noting Johnson's objection. The matter proceeded to trial on that date and the 12-person jury voted 11 to 1 to find Johnson guilty as charged of armed robbery as to counts 2 and 3 of the bill of information.
On February 12, 2001, the State dismissed counts one and four of the bill of information. On that date, Johnson was sentenced to 49½ years of imprisonment at hard labor without benefit of parole, probation or suspension of sentence on each of the two counts, with the sentences ordered to run concurrently, and Johnson lodged an objection to the sentence imposed. Subsequently, Johnson filed a motion for appeal, which the court granted on that date.[2]
On February 14, 2001, the State filed a multiple bill charging Johnson as a thirdfelony offender.[3] On that same date, Johnson denied the allegations of the multiple bill.
On April 4, 2001, a hearing was held on the multiple bill and Johnson was found to be a third-felony offender as to count two of the current conviction. The sentence on count two was vacated and Johnson was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. This sentence was ordered to run concurrently with the sentence previously imposed on count three. Defendant objected to the sentence imposed, however no Motion For Reconsideration of sentence was filed.
The facts underlying the conviction are as follows: On the evening of August 6, 1999, Sylvia George went to a Westbank nightclub to play video poker machines. While there, Ms. George met with a friend, Welton Brown. When Ms. George decided to leave the club at approximately 2:00 a.m. on the morning of August 7, 1999, Mr. Brown offered to walk her to her car, which was parked next door in front of a grocery. The couple walked to Ms. George's vehicle, opened the car door and got into the front seat. A black male then approached the couple and asked for a cigarette. The man was armed with a gun.
Mr. Brown instructed Ms. George to move over in the front seat. As she complied, a second unarmed assailant began to tap on the passenger front window for *111 admission into the vehicle. This assailant, later identified as Thaddeus Johnson, entered the front seat and demanded that Ms. George give him money, but she explained that she had used all her money playing video poker. The unarmed robber then began to "frisk" her to ascertain if she was telling the truth. Ms. George gave the unarmed robber her keys and her purse. Thereafter, the gunman demanded money from Mr. Brown. Mr. Brown asked permission to exit the vehicle in order to reach for his wallet, which was located in his back pocket. Mr. Brown slid out of the vehicle, followed by Ms. George. Mr. Brown surrendered his wallet and beeper, which he was instructed to drop inside the vehicle. The unarmed assailant had moved over on the front seat to a position behind the steering wheel. The gunman entered the car from the front passenger's side. The robbers then fled the scene in Ms. George's vehicle.
The victims summoned police, who responded shortly thereafter to the call. Each victim independently gave a report to the Jefferson Parish Sheriff's officer. A brief time later, a Jefferson Parish plainclothes detective arrived. Ms. George and Mr. Brown were asked to accompany him to Lincolnshire, as the detective told the couple, "I'd like you to look at someone." Upon arriving at the location in Lincolnshire, there were several policemen and a suspect, later identified as Thaddeus Johnson, whom Ms. George and Mr. Brown recognized and positively identified as one of the men who robbed them. Ms. George also recognized her 1988 Plymouth automobile, which had been used as the getaway car. The second assailant had escaped on foot at the time of Johnson's apprehension.
Johnson was transported after his arrest to the Detective Bureau for an interview. The crime scene technicians were summoned to take photographs and fingerprints, however they were not able to secure any prints. Mr. Brown's wallet and beeper were still in the vehicle when it was photographed.
In his first assignment of error, Johnson asserts that the trial court erred in denying defendant's Motion to Suppress the Identification, because there was an element of suggestiveness in the "show-up" procedure that gave rise to a substantial likelihood of misidentification. In his second assignment of error, Johnson argues that the trial court erred in denying defendant's Motion in Limine to exclude any testimony related to the show-up identification, because the identification procedure was a suggestive procedure that gave rise to a substantial likelihood of misidentification.
In both assignment one and two, Johnson argues that the one-on-one identification process in this case was suggestive and gave rise to a substantial likelihood of misidentification. The State replies that the identification passes constitutional muster. The State further argues that the identification was not shown to be suggestive and, even if it was, it did not present a substantial likelihood of misidentification.
One-on-one identifications, known as "show-up" identifications, are not favored; however, under certain circumstances, they are admissible at trial.[4] Such identifications have been found to be admissible when the identification occurred in close proximity to the time of the offense and the suspect is presented for *112 immediate identification.[5] Such a process assures reliability and fosters prompt release of innocent suspects.[6]
In State v. Broadway,[7] the Louisiana Supreme Court discussed the criterion for admissibility of identification evidence at trial:
The defendant has the burden of proof on a motion to suppress out-of-court identification. To suppress an identification, the defendant must first prove that the identification procedure was suggestive.... However, even when suggestiveness of the identification process is proved by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure.
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court held that an identification may be permissible, despite the existence of a suggestive pretrial identification, if there does not exist a "very substantial likelihood of irreparable misidentification." The factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation.
The record reveals the following facts concerning Johnson's identification: The first victim, Sylvia George, testified at the motion to suppress the identification and indicated that she had gotten a "good look" at the men who robbed her on August 7, 1999. She testified that the robbery occurred at Sixth Street and Ames Boulevard at about 2:00 a.m. The area of the robbery was well lighted. Ms. George was in the front seat of her vehicle with the door open and Walton Brown was to her left. A black man approached the couple and asked for a cigarette. Thereafter, Ms. George was told to push over, and this assailant, who was armed, indicated that there was a second perpetrator. The second black male was at the passenger side of the vehicle knocking on the window of the car for Ms. George to unlock the door. Ms. George complied upon seeing that one of the assailants was armed. This suspect entered the vehicle's front seat, which was already occupied by Ms. George and her companion, Mr. Walton Brown. Ms. George indicated she looked at the gunman before he entered the car and while he was in the vehicle, for a total time of between one and four seconds. Thereafter, the unarmed assailant, who was later identified as Thaddeus Johnson, demanded money from Ms. George. According to Ms. George she looked at Johnson longer because he frisked her. Ms. George testified that the police were called immediately after the perpetrators left the scene, and the police responded within ten to fifteen minutes. Ms. George gave a statement to the police. She described the unarmed assailant as being tall, dark and skinny, wearing very thick glasses, dark pants and a dark shirt. Within two hours of the robbery, she and her companion were advised that someone was being held *113 at Lincolnshire, about a mile away, and the officer advised the victims that he wanted to see if they knew the person.
Mr. Walton Brown, Ms. George's companion, also testified regarding the events of August 7, 1999. He indicated that two men participated in the armed robbery and one had a gun. Mr. Brown also testified at the suppression hearing that he got a good look at the assailants. He described the unarmed assailant as wearing thick glasses, a moustache and goatee.
A Jefferson Parish plainclothes police officer transported Ms. George and Mr. Brown to the area in Lincolnshire where the suspect was being held. Ms. George was in the front seat of the police vehicle and Mr. Brown was in the back seat. The victims remained in the police vehicle that transported them to the scene. The streets were illuminated by streetlights and a separate light was shined on the suspect. The suspect was not in a vehicle. There was 20 to 25 feet between the place where the suspect was located and the police vehicle, containing the victims, was parked. Ms. George and Mr. Brown testified that each could see the subject plainly at the time of this presentation. Ms. George and Mr. Brown were not separated for the identification. Both victims identified the suspect as one of the persons who had robbed them that night. Although Ms. George gave the first identification, according to this victim, her response and that of Mr. Brown was almost simultaneous. Both Ms. George and Mr. Brown gave positive identifications of Johnson as one of the robbers. The victims each testified that they did not feel they had to make an identification, nor were they threatened or promised anything to do so.
In denying the motion to suppress the identification, the trial judge gave the following reasons:
THE COURT:
Clearly, the procedure used by the police in this case was not the best procedure; however, the Court did hear the testimony of these two witnesses. The Court had an opportunity to view their demeanor, to judge their credibility and their sincerity with regard to the identification that was made that evening.
The Court also clearly believes that any suggestion that may [have] occurred as a result of the procedure handled had no effect on the identification made by these two individuals. The motion for suppression of identification is denied.
Although the "show-up" identification may be viewed as suggestive, because of its undue focus on the detainee, and the failure of the police to separate the victims at the time of their identification, these facts alone will not result in an identification being fatally flawed. The defendant must also prove that, on the facts presented, the suggestiveness created a "very substantial likelihood of misidentification." Johnson has failed to prove this.
The State negated the likelihood of misidentification, by presenting evidence at the suppression hearing that satisfied a number of the Manson factors listed above.[8] That evidence clearly indicated that the victims in this case each had viewed their assailant in a well-lighted area for some time during the commission of the robbery. They each were able to give an accurate description of the assailant to the police. Within two hours, the victims were transported a short distance to the place of identification. The area of the identification was well-lighted and the victims were located a short distance from the suspect at the time of the identification. *114 The victims each positively identified the suspect as being their assailant in an almost simultaneous manner and without any outside influence.
Under these circumstances, we find that the trial court judge correctly denied the motion to suppress the identification.
In his second assignment of error, defendant alleges that the trial judge erred in refusing to grant his motion to exclude identification testimony at trial. Prior to the commencement of trial, defendant presented an oral motion in limine wherein he sought to exclude identification testimony at the trial. He presented an argument which was very similar to that presented at the motion to suppress the evidence wherein he stressed the suggestive nature in which the identification occurred. The State responded and indicated that the court had already had a protracted hearing on the issue and the court had ruled. The trial court denied the motion for the following reasons:
THE COURT:
All right. The motion in limine is denied. The court had already heard the motion to suppress at length, heard from the witnesses at the hearing, and the Court was convinced that the motion to suppress was not appropriate. The argument today does not change the Court's opinion.
For the reasons previously stated, the trial court correctly denied Johnson's motion in limine, which, in essence, was defendant's second attempt to exclude evidence that had already been ruled admissible.
Therefore we find Johnson's first two assignments of error to be without merit.
In his third assignment of error Johnson argues that the trial court erred in refusing to allow him to introduce into evidence transcripts of the audio taped statements given by Welton Brown and Sylvia George to Sergeant Graffeo on the night of the robbery describing suspect number two. Specifically, Johnson contends that the trial court erred in refusing to admit the transcripts of the victims' audio taped statements that allegedly contained their prior inconsistent statements. The State counters that the evidence was correctly found to be inadmissible, in that it was used not for impeachment, but to refresh the witnesses' memory, and the proper foundation was not presented for it to be admitted into evidence.
At the conclusion of the trial, defense counsel sought to admit the transcribed statements of Ms. George and Mr. Brown into evidence. The trial judge ruled that they were inadmissible, but allowed a proffer of the evidence. The following events occurred during the trial of this matter leading to the ruling by the trial judge:
During the cross-examination of Ms. George, defense counsel asked her if she remembered the weight she gave police in her description of Johnson. She responded that she did not know if she said 140 pounds or what, as she couldn't remember. Defense counsel then asked her to read to herself a portion of the transcribed statement she gave investigators on the morning of the crime. The State objected to the use of the statement on the basis that no foundation had been presented by the defense. The record reflects that the following discourse took place:
THE COURT:
You want to use it to refresh her memory?
MR. SCHMIDT [Defense]:
This is not a police report.
. . . .
THE COURT:

*115 All right. Do you want to present it to her so that she can refresh her memory then you can question her?
MR. SCHMIDT:
Yes.
Thereafter, defense counsel allowed the witness to review her statement each time before specifically asking the witness the age and weight of Johnson as stated to the police on the night of the crime.
A writing may be used to refresh a witness' memory. In this regard, LSA-C.E. art. 612 provides, in pertinent part, as follows:
B. Criminal cases. In a criminal case, any writing, recording, or object may be used by a witness to refresh his memory while testifying. If a witness asserts that his memory is refreshed he must then testify from memory independently of the writing, recording, or object. If while testifying a witness uses a writing, recording, or object to refresh his memory an adverse party is entitled... to examine the witness thereon and to introduce in evidence those portions which relate to the testimony of the witness. (Emphasis added).
Further, when a writing is used to refresh a witness' memory, "it is the testimony and not the writing which is the evidence."[9]
In this case, it is clear that the writing was specifically used to refresh Ms. George's memory and it was not used for impeachment purposes, as now alleged by defendant. Accordingly, Ms. George's testimony was the evidence and no basis exists for the admissibility of the written statement. Therefore, we find that the trial court judge correctly refused to allow defendant to admit Ms. George's statement into evidence.
During the cross-examination of Mr. Brown, defense counsel apparently used the witness' prior statement to police to formulate his leading questions to this witness. Defense counsel first asked Mr. Brown what description of Johnson he had given the police. Mr. Brown testified that he told them that Johnson had a dark complexion, was tall, and wore glasses. Defense counsel then asked Mr. Brown if he had told police that Johnson was about 5 feet in height. Mr. Brown agreed and stated defendant was 5 feet in height or a little taller. Defense counsel next asked the witness if he had told police that Johnson weighed 150 pounds, 160 pounds, and 175 pounds. The witness agreed and then explained that defendant was smaller at the time of the robbery, but has since gained weight. In his final question regarding the description given to police, defense counsel asked Mr. Brown if he had described the gunman as having "Jheri Curls." The witness denied this. Upon further questioning regarding the response, the witness admitted that he might have said this. Upon further reflection, Mr. Brown stated that he wasn't sure.
Defense counsel did not offer the statement into evidence at the time of the examination of Mr. Brown, nor did he show Mr. Brown the statement.
A witness' prior inconsistent statement may be used to impeach his credibility. In this regard, LSA-C.E. art. 607 provides, in pertinent part:
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.

*116 (2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
In order for the prior inconsistent statements to be admissible, a proper foundation must be laid.[10] Thus, the proponent must first fairly direct the witness' attention to the statement and the witness must be given the opportunity to admit the fact and distinctly fail to do so.[11] If the witness' attention is directed to the statement and he fails to distinctly admit it, the statement is admissible into evidence.[12] If, however, the witness admits the statement, he has impeached himself by his own testimony and thus, the statement is inadmissible.[13]
During cross-examination, except for his final question on the subject, defense counsel failed to establish any contradictory testimony or apparent inconsistencies in the trial testimony of Mr. Brown and the prior statements he had given to police. As such, no basis existed for the impeachment of Mr. Brown with the use of extrinsic evidence and no efforts to impeach him were made.
With regard to the final question on the subject, an apparent inconsistency existed between the current testimony and the statement given police, as the witness at first denied telling police the gunman had "Jheri Curls" and later said he could not remember. Although this response established the basis for use of the police statement to impeach this witness, Johnson took no steps in furtherance of the impeachment.[14] As such, we find that the trial judge correctly refused to admit this statement into evidence.
For the foregoing reasons, Johnson's third assignment of error is without merit.
In his fourth assignment of error, Johnson claims that the trial court erred in failing to follow the sentencing guidelines of La.C.Cr.P. art. 894.1 and in imposing a constitutionally excessive sentence. Johnson reasons that the trial judge failed to take into consideration mitigating factors set forth in LSA-C.Cr.P. art. 894.1. In this regard, he argues that he had no weapon, did not physically harm anyone, was gainfully employed, and was active in the church. He also contends that the trial judge failed to take into account the fact that the legislature has recently reduced penalties for offenders, such as him.
The State replies that the sentence imposed is within statutory limits and is a mandatory minimum. Additionally, the State points out Johnson has failed to demonstrate that the sentence imposed is disproportionate to his history of offenses and convictions.
The record indicates that the court originally sentenced Johnson to two concurrent sentences of 49½ years of imprisonment at hard labor, without benefit of parole, probation or suspension of sentence on the two armed robbery convictions. Prior to *117 the imposition of these sentences, the trial court judge complied with the sentencing guidelines of LSA-C.Cr.P. art. 894.1.
The trial judge stated that he had reviewed the entire record and he found that incarceration was warranted because of the undue risk that defendant would commit another crime. The judge also took into account that a weapon was used in the commission of the offenses against the two victims and the victims were disturbed by this use of force. Johnson objected to this sentence.
Thereafter, the State billed Johnson as a third-felony offender.[15] Johnson denied the allegations of the multiple bill. A hearing was held on the multiple bill and the State presented identification evidence and evidence of two prior felony convictions for sexual battery and unauthorized entry into an inhabited dwelling.[16] The trial court judge found Johnson to be a third-felony offender.[17] The judge also found that the prior offenses were "crimes of violence."[18] The prior sentence on one of the armed robbery convictions was vacated and an enhanced sentence was imposed under LSA-R.S. 15:529.1(A)(1)(b)(ii). The court sentenced Johnson as a third-felony offender to life imprisonment, without benefit of parole, probation or suspension of sentence.
Defendant was sentenced pursuant to LSA-R.S. 15:529.1(A)(1)(b)(ii), which provides, in pertinent part, as follows:
A. (1) Any person who, after having been convicted within this state of a felony ... thereafter commits any subsequent felony within his state, upon conviction of said felony, shall be punished as follows:
(b) If the third-felony is such that upon a first conviction, the offender would be punishable by imprisonment for any term less than his natural life then:
. . . .
(ii) If the third-felony or either of the two prior felonies is a felony defined as a crime of violence under R.S. 14:2(13) ... the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.
Both armed robbery and sexual battery are defined under LSA-R.S. 14:2(13)(l)(w) as crimes of violence. Thus, defendant met the qualifications to be given the mandatory life sentence under the Habitual Offender Statute. Johnson lodged a general objection to the multiple offender sentence. He did not state grounds for the objection nor did he file a motion for reconsideration of sentence.[19] Under these circumstances, we review the sentence for constitutional excessiveness.[20]
The Eighth Amendment of the United States Constitution and Article I, Section 20, of the Louisiana Constitution prohibit the imposition of excessive or cruel punishment. In State v. Dorthey,[21] and State v. Johnson,[22] the Louisiana Supreme Court recognized that a mandatory minimum sentence under the Habitual Offender Law may still be reviewed for constitutional excessiveness.
*118 The court in Dorthey,[23] specifically held that when a trial court determines the minimum sentence mandated by the Habitual Offender Law makes no "measurable contribution to acceptable goals of punishment" or when the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," the trial judge must reduce the sentence to one that would not be constitutionally excessive. The court in State v. Johnson,[24] cautioned that a trial judge's determination that a mandatory minimum sentence is excessive requires more than merely uttering of these stated phrases.
The sentencing judge must always start with the presumption that a mandatory minimum sentence under the Habitual Offender Law is constitutional.[25] A court may only depart from the minimum sentence if it finds that there is clear and convincing evidence in the particular case before it that would rebut the presumption of constitutionality.[26]
When seeking to rebut the presumption of constitutionality, the defendant must show by clear and convincing evidence that he is "exceptional, which... means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case."[27] Downward departures should only occur in rare situations.[28] When evaluating whether the defendant has met his burden, the trial court must be mindful of the goals of the Habitual Offender Law, which was enacted to deter and punish recidivism. If a downward departure is warranted, the sentencing court must impose the longest sentence that is not constitutionally excessive, with specific reasons as to why this sentence is not constitutionally excessive.[29]
Defendant argues that the trial court, in imposing the life sentence, failed to consider mitigating factors under LSA-C.Cr.P. art. 894.1. This argument is misplaced. Compliance with sentencing guidelines is not required, where, as here, the sentence imposed is statutorily prescribed, under the Habitual Offender Law.[30] Johnson also contends that the trial court judge failed to take into consideration at sentencing that the penalties for recidivist have been recently reduced.[31] Although he concedes the enactment is not controlling in his case, he nonetheless contends that this is a factor the trial judge should have taken into account in sentencing. This grounds for objection is presented for the first time on appeal and for that reason is not reviewable by this Court.[32]
Accordingly, we find that the record on appeal is devoid of any basis for consideration of a downward departure from the *119 mandatory sentence imposed by the trial court.
Moreover, the facts of this case warrant the sentence imposed. Defendant was a principal to two armed robberies on the same night. The fact that he was not the gunman is of no moment, because when one acts in concert with another to commit a crime, each participant is responsible for the other's actions.[33] As the trial court noted, at the original sentencing, the victims were disturbed by the use of force during the commission of the offenses. Additionally, the record indicates defendant has a long history of felony offenses, having been convicted of a prior sexual battery, two burglaries of inhabited dwellings, unauthorized use of a vehicle, aggravated assault, simple battery, and two armed robberies, in addition to arrests for fleeing from police and a third armed robbery. He is a serious repeat felony offender of the type this statute was intended to punish.
The statutorily prescribed life sentence is not constitutionally excessive under the facts presented. Therefore we find Johnson's fourth assignment of error to be without merit.
Johnson, by Assignment of Error Number Five, alleges that his trial counsel was ineffective in that he failed to file a motion for reconsideration of sentence and he argues that this action preludes this Court from reviewing his sentence. The State counters that the failure of the defense counsel to file a timely motion for reconsideration does not preclude review of the sentence for constitutional excessiveness. Further the State argues that defendant has failed to demonstrate how the results would have been different if such a motion had been filed.
Claims of ineffective assistance of counsel are generally relegated to postconviction proceedings. However, such claims may be addressed on direct review where the record discloses the necessary evidence to decide the issue.[34] In asserting a claim of ineffective assistance of counsel, a two-pronged test is employed. The defendant must show that (1) counsel's performance was deficient, and (2) the deficiency prejudiced him.[35] To show prejudice, the defendant must demonstrate that but for the unprofessional conduct, the outcome of the proceedings would have been different.[36]
As previously discussed, objection by defendant at the time of sentencing preserved the issue for appellate review as to constitutional excessiveness. We have reviewed the claim of excessiveness and find, for the reasons discussed, that the sentence is not unconstitutionally excessive. Johnson has failed to demonstrate how the filing of the requisite motion would have changed this result. Johnson also has not made the requisite showing of deficient performance and prejudice, as required by Strickland, supra.[37] Hence, his claim of ineffective assistance of counsel is not substantiated. For these reasons, Johnson's assignment of error number five is without merit.
*120 The record was reviewed for errors patent, according to LSA C.Cr.P. art. 920; State v. Oliveaux,[38] and State v. Weiland;[39] no patent errors were found.
The conviction against defendant is affirmed.
AFFIRMED.
NOTES
[1] The motion was denied as to counts 2 and 3 only. The court reserved a ruling on the motion as it applied to count 4, because of the victim's absence.
[2] The trial court retained jurisdiction for the multiple offender proceeding. LSA-C.Cr.P. art. 916. The motion for appeal was premature when filed after the original sentence. This defect was cured by the subsequent resentencing. State v. Page, 96-227, p. 4 (La. App. 5 Cir. 8/28/96), 680 So.2d 104, 106 n. 2, writ denied, 96-2543 (La.9/19/97), 701 So.2d 153.
[3] LSA-R.S. 15:529.1.
[4] State v. Jackson, 96-661 (La.App. 5 Cir. 4/9/97), 694 So.2d 440, 447, writ denied, 97-1050 (La.10/13/97), 703 So.2d 609 and 97-1255 (La.10/13/97), 703 So.2d 612.
[5] State v. Robinson, 404 So.2d 907, 909-910 (La.1981).
[6] Id.
[7] 96-2659 (La.10/19/99), 753 So.2d 801, 812, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000) (citations omitted).
[8] Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
[9] State v. Young, 552 So.2d 669 (La.App. 2 Cir.1989).
[10] LSA-C.E. art. 613; State v. Jarvis, 97-1174 (La.App. 5 Cir. 4/9/98), 710 So.2d 831, 835, writ denied, 98-2219 (La.1/8/99), 734 So.2d 1222.
[11] LSA-C.E. art. 613.
[12] State v. Mayeux, 94-105 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 833-834.
[13] Id. at 833, 834 (citing State v. Taylor, 593 So.2d 431 (La.App. 2 Cir.1992)).
[14] LSA-C.E. art. 613.
[15] LSA-R.S. 15:529.1.
[16] LSA-R.S. 14:43.1; 14:62.3.
[17] LSA-R.S. 15:529.1.
[18] LSA-R.S. 14:2(13).
[19] LSA-C.Cr.P. art. 881.1.
[20] State v. Mims, 619 So.2d 1059, 1059-1060 (La.1993).
[21] 623 So.2d 1276, 1280 (La.1993)
[22] 97-1906 (La.3/4/98), 709 So.2d 672, 676.
[23] Supra, at 1280.
[24] 709 So.2d at 676.
[25] Id.
[26] Id. at 676.
[27] Id.
[28] Id. at 677.
[29] Id. at 677.
[30] State v. Johnson, 31,448 (La.App. 2 Cir 3/31/99), 747 So.2d 61, writ denied, 749 So.2d 653, cert. denied, 529 U.S. 1114, 120 S.Ct. 1973, 146 L.Ed.2d 802 (2000).
[31] 2001 La. Acts 403.
[32] LSA-C.Cr.P. art. 841; State v. Richmond, 278 So.2d 17, 23 (La.1973).
[33] State v. Randall, 99-2476 (La.12/15/00), 776 So.2d 424, 425.
[34] State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382, 391-392.
[35] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[36] State v. Williams, 97-970 (La.App. 5 Cir. 1/27/98), 708 So.2d 1086, 1089.
[37] State v. Jackson, 00-191 (La.App. 5 Cir. 7/25/00), 767 So.2d 833.
[38] 312 So.2d 337 (La.1975).
[39] 556 So.2d 175 (La.App. 5 Cir.1990).